UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **LARRY BILES, JESSE LEE ALEXANDER CROXTON**, <br><br> Plaintiffs, <br><br> v. <br><br> **MARK BESSNER, TROOPER "UNKNOWN" KURISH, JOHN DOE SUPERVISOR**, <br><br> Defendants. | 19-cv-10779 <br><br> HON. TERRENCE G. BERG <br><br><br> **ORDER DENYING MOTION FOR SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF BILES** |

This is an excessive-force case stemming from the aftermath of a six-minute police chase that occurred in the metro Detroit area in 2016. Plaintiffs Larry Biles and Jesse Lee Alexander Croxton say that two Michigan State Police Troopers, Defendants Mark Bessner and Christopher Kurish, violated Plaintiffs' Fourth Amendment rights by punching and kicking them without justification, also tasing Biles and holding his head underwater while he was handcuffed. Plaintiffs further assert a claim for individual supervisory liability against the officers' unidentified "John Doe" Supervisor. The case is now before the Court on Plaintiff Biles's motion for summary judgment against Defendants Bessner and Kurish. Biles contends there is no genuine issue of material fact as to whether Bessner and Kurish used excessive force against him in violation of his Fourth Amendment rights. ECF No. 18. Although the

1

Clerk of Court has already entered default against Defendant Bessner for failure to plead or otherwise defend, and Bessner did not file a response brief, the Court finds that Defendant Kurish has come forward with evidence raising a genuine issue of material fact as to whether each of the Defendants used excessive force against Biles. Accordingly, Biles's motion for summary judgment, ECF No. 18, must be denied.

## BACKGROUND

The police chase that gave rise to this case unfolded in Oak Park, Michigan on April 13, 2016. ECF No. 18-2, PageID.123 (Biles Dep. Tr.). Plaintiffs had made plans to work on one of Biles's cars together that day. ECF No. 20-3, PageID.443 (Croxton Dep. Tr.). Biles picked up Croxton in his Dodge Charger and the two friends began driving back to the car Biles wanted to work on. ECF No. 1, PageID.3 (Compl.); ECF No. 20-3, PageID.444. Michigan State Police Troopers Bessner and Kurish, Defendants in this case, were riding in a marked police car and observed that the license plate of the Charger Biles was driving was in fact registered to a Chrysler 300, so they attempted to pull Plaintiffs over. ECF No. 20-2, PageID.415 (Police Report). Instead of pulling over when the Defendant troopers activated their overhead lights, Plaintiffs fled. ECF No. 18-2, PageID.70, 97, 116; ECF No. 20-2, PageID.416. *But see* ECF No. 20-3, PageID.449 (testifying that Biles initially pulled over before speeding off).

The police report describes the chase as lasting approximately six minutes, with Biles reaching a peak speed of almost 140 miles per hour. ECF No. 20-2, PageID.415–16; ECF No. 18-2, PageID.123–24. During the course of the chase, Plaintiffs disregarded red lights and stop signs, and narrowly avoided colliding with other cars. ECF No. 18-2, PageID.124; ECF No. 20-2, PageID.416. Eventually, Plaintiffs' Charger became stuck in the mud, at which point the Defendant troopers pulled their marked car in front of the Charger to block its path. ECF No. 18-2, PageID.126.

Biles, who is African American, testified that he fled because Croxton told him to, and because he thought he was being unfairly racially profiled by the troopers. ECF No. 18-2, PageID.118–19. Croxton testified his in deposition that he told Biles to flee because he worried the troopers would take the several thousand dollars in cash they had in the Charger, and because Croxton had a gun with him he didn't want the troopers to find. ECF No. 20-3, PageID.449–50. Although the police report indicates the troopers later found approximately $11,000 in cash in the Charger, it mentions nothing about a gun. ECF No. 18-2, PageID.119, 121, 127. Croxton says the officers never found it, and the state agrees that no gun was found. ECF No. 20-3, PageID.450.

Once Plaintiffs' car became stuck in the mud, it is undisputed in the parties' deposition testimony that Biles waited with his hands on the steering wheel for the Defendant troopers to approach his car. ECF No. 1, PageID.3; ECF No. 18-6, PageID.327. The police report simply states

that, "[a]t the conclusion of the pursuit . . . Biles refused to exit the car." ECF No. 20-2, PageID.415, 417. It's unclear whether the description of Biles's refusal refers to his actions immediately after his Charger came to a stop or later in time, after the troopers say he pulled away from them as they tried to get him out of the car. Trooper Kurish acknowledged during his deposition that Biles could not have posed a threat to officer safety simply by refusing to exit his car, without engaging in any other acts of resistance or noncompliance. ECF No. 18-6, PageID.326.

Nonetheless, when Biles began opening his car door to comply with the troopers' command to "Get the fuck out of the car," Plaintiffs assert Trooper Bessner immediately tased him, without provocation. ECF No. 1, PageID.4; ECF No. 18-2, PageID.133; ECF No. 20-3, PageID.451–52; ECF No. 18-6, PageID.302. Exactly when Trooper Bessner first tased Biles is somewhat in dispute. According to Plaintiffs, Bessner tased Biles at least three times while he was still inside the Charger even though he was not resisting in any way. ECF No. 18-2, PageID.140.

At odds with Plaintiffs' sequence of events, Trooper Kurish testified that Bessner first used his taser after Kurish had already removed Croxton, who had been in the Charger's passenger seat, and placed him onto the ground. ECF No. 18-6, PageID.301, 349–50. After Croxton was handcuffed, Trooper Kurish, still at the passenger side of the car, said he saw Biles pulling away from Trooper Bessner inside the car. ECF No. 18-6, PageID.343–44. Kurish then pepper-sprayed Biles from the passenger

4

side of the car in an effort to assist in subduing him. ECF No. 18-6, PageID.343–44. "When that didn't work," Trooper Kurish said, "I determined I would need to go to the driver's side of the car and help Mr. Bessner get Mr. Biles out of the car." ECF No. 18-6, PageID.344.

It was in that window of time, while Trooper Kurish was moving from the passenger side of the car to the driver side, that Kurish asserts Trooper Bessner first tased Biles. ECF No. 18-6, PageID.344, 350. According to Kurish, when he arrived at the driver side of the Charger he saw Biles, still inside the car, pulling his arm away from Trooper Bessner and "holding onto the steering wheel with both of his hands." ECF No. 18-6, PageID.343–49.

Elsewhere in his deposition testimony, however, Kurish says "[a]t some point, I don't know what point it was, Mr. Bessner used his taser and still Mr. Biles was in the driver seat of the vehicle." ECF No. 18-6, PageID.302. Because he was moving around the car at the time, Kurish claims he could not see Bessner tase Biles the first time and is thus (according to his deposition testimony) unable to assess whether Biles was actively resisting or, relatedly, whether Bessner's taser use was justified. ECF No. 18-6, PageID.328. When asked during his deposition whether it was "necessary" for Trooper Bessner to tase Biles before getting him out of the car, Trooper Kurish responded, "I didn't see that part of why he was tasered so I don't know why Mr. Bessner tasered him." ECF No. 18-6, PageID.328.

5

Briefly, concerning Croxton, who is not moving for summary judgment, the parties agree he was not resisting being placed in handcuffs and complied fully with the troopers' instructions. Plaintiffs say the troopers nonetheless proceeded to "punch and kick [Croxton]" multiple times after he was handcuffed, badly injuring his right knee and knocking out three of his teeth. ECF No. 1, PageID.4; ECF No. 18-2, PageID.137–39; ECF No. 20-3, PageID.440–41, 452–53 (Croxton Dep. Tr.); ECF No. 18-6, PageID.279 (Kurish Dep. Tr.). In contrast, the police report describes Croxton as being handcuffed "without incident." ECF No. 20-2, PageID.417.

After the troopers pulled Biles from the Charger, Trooper Kurish testified that Biles was "punching, kicking, [and] pulling away" from them. ECF No. 18-6, PageID.302. Trooper Kurish witnessed Bessner tase Biles several more times while he lay on the ground outside of the car. ECF No. 18-6, PageID.350. At one point, Kurish noticed Biles "had [ ] Bessner's taser in his right hand" and began punching Biles's right arm to get the taser away from him. ECF No. 18-6, PageID.302. These assertions are repeated in the police report. ECF No. 20-2, PageID.417. After several seconds, Trooper Kurish says, the Troopers managed to subdue Biles and place him in handcuffs. ECF No. 18-2, PageID.136–37.

Concerning the troopers' use of force on Biles after he was handcuffed, Trooper Kurish admitted only to "deliver[ing] a couple of knee strikes to . . . the right side of his body" because, he claims, Biles

6

was still trying to kick the troopers. ECF No. 18-6, PageID.302. As for Trooper Bessner, Kurish said, he "did not see everything specifically that happened between Mr. Biles and Mr. Bessner." ECF No. 18-6, PageID.305. The police report indicates Bessner used the taser "several" times on Biles and made "several knee strikes" to his midsection, characterizing those efforts as "ineffective" to subdue him. ECF No. 20-2, PageID.417. The Taser Report confirms Trooper Bessner used his weapon seven times between 7:23 p.m. and 7:25 p.m. on April 13, 2016, the date and time of this incident. ECF No. 18-4, PageID.260.

In a significant departure from the police report and Trooper Kurish's testimony, Plaintiffs testified that, after Defendants handcuffed both Croxton and Biles, the troopers put on "black leather gloves" and began to punch and kick Biles. ECF No. 1, PageID.5. Trooper Bessner, Biles said, then shoved Biles's face into a puddle of water and prevented him from coming up to breathe. ECF No. 1, PageID.5; ECF No. 18-2, PageID.145. When Biles tried to turn his head to find air, Trooper Kurish, according to the Complaint, punched him in the face. ECF No. 1, PageID.5. Biles testified that it felt like the troopers were trying to drown him. ECF No. 18-2, PageID.145. Biles next testified that Defendant Bessner tased him "three or four more times" in the side of his head and his body while he was in the water, also accidently shocking himself, as the taser shock was conducted by the water. ECF No. 18-2, PageID.139–

7

142, 144, 147. In deposition testimony, Biles said he thought he was "about to die," and was "fighting for [his] life." ECF No. 18-2, PageID.146.

The troopers ultimately arrested Biles for fleeing and eluding, assaulting a police officer, disarming a police officer, driving with a suspended license, and for "numerous outstanding warrants." ECF No. 20-2, PageID.415. Inside the Charger, the troopers found roughly $11,000 in cash, as well as a 473 ml. bottle of liquid codeine and 77 oxycodone tablets that Biles testified were prescribed to him by a healthcare provider (but that Croxton said belonged to him and were obtained without a prescription). ECF No. 18-2, PageID.119, 121, 127; ECF No. 20-3, PageID.451. Following this incident, the Defendant troopers transported Biles to the hospital, where he required a wheelchair to move around and was given stitches on his lip. ECF No. 18-2, PageID.149.

Plaintiffs filed the instant lawsuit in March 2019 claiming excessive use of force by Defendants in violation of the Fourth Amendment, as enforced via 42 U.S.C. § 1983. Although Trooper Bessner appeared for deposition in this matter, he immediately asserted his Fifth Amendment right to remain silent, explaining that the Michigan State Police Troopers Association "has unilaterally decided they're not going to defend me in this matter." ECF No. 18-5, PageID.266 (Bessner Dep. Tr.). As referenced by Trooper Kurish during his deposition, Bessner was convicted of involuntary manslaughter in May 2019 for the tragic death of a 15-year-old that occurred while Bessner was acting in his capacity as

8

a Michigan State Trooper. ECF No. 18-6, PageID.293–94. That case also involved Bessner's taser use.

At Plaintiffs' request, the Clerk of Court entered default against Defendant Bessner for failure to plead or otherwise defend this case. ECF Nos. 7, 8. Plaintiffs have not yet moved the Court to enter default judgment against Bessner, as is required under Rule 55 of the Federal Rules of Civil Procedure. He therefore remains a party to this case.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). On a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the non-moving party. *Matsushita*, 475 U.S. at 587 (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

## DISCUSSION

Claims that an officer used excessive force in effecting an arrest are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). In applying that standard, the Court assesses "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Critically, the reasonableness of an officer's use of force must be examined "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). The "bottom-line inquiry" is thus "whether the totality of the circumstances justifies a particular level of force." *Coffey v. Carroll*, 933 F.3d 577, 588 (6th Cir. 2019) (citing *Mitchell v. Schlabach*, 864 F.3d 416, 421 (6th Cir. 2017)). In conducting this inquiry, the Court may consider several factors, including: the severity of the crime the suspect is being arrested for; whether the suspect poses a risk to officer safety; and whether the suspect is actively resisting arrest of attempting to flee. *Graham*, 490 U.S. at 396.

### A. Trooper Bessner's use of force against Biles before he was removed from the car and handcuffed

Biles claims, first, that Trooper Bessner used excessive force when he tased Biles before the troopers removed him from the car and handcuffed him. ECF No. 18, PageID.70 (Pl.'s Mot. for Summ. J. Br.).

10

Although tasing Biles inside his car would constitute excessive force if Biles was not resisting, the evidentiary record is somewhat muddled when it comes to the question of whether Biles was actively resisting or refusing to be handcuffed while inside the Charger. Accordingly, the Court finds that disputed issues of material fact preclude summary judgment on the question of whether Trooper Bessner used excessive force in tasing Biles while he remained inside the Charger.

It is well-established in the Sixth Circuit that using a taser on an individual who does not resist, or has stopped resisting, constitutes excessive force. *Kent v. Oakland Cty.*, 810 F.3d 384, 396 (6th Cir. 2016) (quoting *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010)). In *Kijowski v. City of Niles*, for example, a case factually similar to Plaintiffs' version of events in this matter, the Sixth Circuit deemed objectively unreasonable an officer's decision to drag the plaintiff out of his truck, throw him to the ground, and immediately tase him when the record indicated he was not resisting arrest or engaging in a physical struggle with the officer. 372 F. App'x at 599.

In contrast, the court of appeals has held that tasing a suspect who "actively resists and refuses to be handcuffed" does not violate the Fourth Amendment. *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012). The reasonableness of an officer's taser use thus "turns on active resistance." *Kent*, 810 F.3d at 392. "[A]ctive resistance," means "noncompliance . . . paired with any signs of verbal hostility or physical

11

resistance." *Elridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013). "[P]hysically struggling with, threatening, or disobeying officers," all constitute active resistance. *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012) (collecting cases). So does refusing to move your hands to allow police to handcuff you, "at least if that inaction is coupled with other acts of defiance." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (citing *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94, 96–97 (6th Cir. 2012); *Williams v. Ingham*, 373 F. App'x 542, 549 (6th Cir. 2010)). Engaging in "a physical struggle to maintain control of one's limbs while being placed in handcuffs can [also] be active resistance." *Jackson v. Washtenaw Cty.*, 678 F. App'x 302, 307 (6th Cir. 2017).

A throughline of excessive-force jurisprudence in this circuit holds that mere noncompliance with officers' instructions, without more, is insufficient to establish the active resistance necessary to make an officer's taser use objectively reasonable. *Eldridge*, 533 F. App'x at 535. In *Kent v. Oakland County*, the Sixth Circuit found that, although the plaintiff refused to comply with police demands, he "never demonstrated physical violence," was not told he was under arrest, and did not appear to pose a threat to officer safety. *Kent*, 810 F.3d at 396. Under those circumstances, the court held, it was excessive force for the officer to tase him. *Kent*, 810 F.3d at 396. And certainly courts will not find active resistance where the plaintiff has done nothing to resist arrest, is being

12

fully compliant, has stopped resisting, or is already detained. *Rudlaff*, 791 F.3d at 641; *Hagans*, 695 F.3d at 509; *Cockrell*, 468 F. App'x at 496.

What exactly constitutes active resistance is admittedly a tricky and fact-bound inquiry. What is clear, however, is that "[w]hen a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015). The question of whether it was objectively unreasonable for Trooper Bessner to tase Biles while he was inside the Charger thus boils down to the question of whether Biles was at that point actively resisting and refusing to be handcuffed.

Both sides agree that, once the Charger became stuck in the mud, effectively ending the police chase, Biles waited with his hands on the steering wheel for the Defendant troopers to approach his car. ECF No. 1, PageID.3; ECF No. 18-6, PageID.327. Such behavior is not resistance of any kind, let alone active resistance. Accordingly, it would not warrant an officer's use of a taser or physical force, such as knee strikes. According to Biles's deposition testimony, "as soon as [he] opened the door [Trooper Bessner] shot me with the taser in the chest. And then I was like—I just screamed. I was like in shock." ECF No. 18-2, PageID.133. *See* ECF No. 20-3, PageID.451–52; ECF No. 18-6, PageID.302. Bessner, according to Biles, immediately tased him "at least three times when [he] was inside the car." ECF No. 18-2, PageID.133. The third time he was tased, Biles

13

said he pulled the taser prongs out of his chest. ECF No. 18-2, PageID.134. It was only then, according to Biles's testimony, that the troopers pulled him out of the car and took him to the ground. ECF No. 18-2, PageID.134.

During his deposition, Trooper Kurish, presented a different account of Biles's behavior and the timing of Trooper Bessner's taser use. According to Kurish, Biles remained in the Charger during the seconds or minutes Kurish was occupied with getting Croxton out of the car, secured, and onto the ground. ECF No. 18-6, PageID.301, 349–50. Although Kurish acknowledged he had not heard Biles make any threats to either trooper, he said that Biles, "a large individual," "had just been in a really high-speed chase," had been told by the trooper that he was under arrest, was not complying with verbal commands to get out of the car, and "grabbed ahold the steering wheel." ECF No. 18-6, PageID.337, 340–42. Trooper Kurish characterized this behavior as "[r]efusing to be arrested." ECF No. 18-6, PageID.342.

Next, Kurish said he pepper-sprayed Biles after watching him "pulling away from" Trooper Bessner, apparently from where he was standing on the other side of the car. ECF No. 18-6, PageID.344. According to Kurish, he pepper-sprayed Biles before moving from the passenger side of the car to the driver side, where Biles was sitting. *See* ECF No. 18-6, PageID.343–44. Kurish pepper-sprayed Biles, he said, because Biles was resisting Trooper Bessner's efforts to get him out of the

14

car and thought doing so would "assist" Bessner. ECF No. 18-6, PageID.344. "When that didn't work, [Kurish] determined [he] would need to go to the driver's side of the car and help Mr. Bessner get Mr. Biles out of the car." ECF No. 18-6, PageID.344. It was only after Kurish began moving to the driver side of the car that he says Bessner used his taser. ECF No. 18-6, PageID.344.

The parties thus dispute whether Trooper Bessner immediately tased Biles without encountering any resistance or whether, having been told he was under arrest, Biles refused to comply with verbal commands to exit the vehicle and moved his limbs away from Trooper Bessner to avoid being handcuffed or arrested. There is Sixth Circuit precedent that, if a jury were to credit Trooper Kurish's version of events, plausibly supports finding that Biles was engaged in active resistance that would justify taser use. *See Rudlaff*, 791 F.3d at 641 (explaining that refusing to move one's hands to allow police to handcuff you can constitute active resistance "at least if that inaction is coupled with other acts of defiance."); *Jackson*, 678 F. App'x at 307 (holding that participating in "a physical struggle to maintain control of one's limbs while being placed in handcuffs can [also] be active resistance."). Although the question is close, there is a dispute of fact as to whether Biles was actively resisting, and such close questions of fact and credibility should be left to the jury. Summary judgment in favor of Biles on the question of whether Trooper

15

Bessner used excessive force in tasing Biles while he was in the Charger will therefore be denied.

Although Biles does not expressly seek summary judgment on the question of whether it was excessive force for Kurish to pepper spray Biles while he was inside the car, the Court will briefly address that issue as it was addressed by the parties in their response and reply briefs. ECF Nos. 20, 21. For largely the same reasons that summary judgment is not warranted on the question of whether Trooper Bessner's taser use while Biles remained in the car was excessive, summary judgment on the issue of whether Trooper Kurish's pepper-spraying was appropriate will also be denied. Although it is excessive force for an officer to pepper spray a suspect who has not been told he is under arrest and is not resisting arrest, *Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009), under the disputed facts of this case, where Defendant Kurish has presented testimony that Biles had been told he was under arrest, and was resisting arrest, it is not clear that Kurish's use of pepper spray was a Fourth Amendment violation. Summary judgment on that question will therefore be denied.

> **B. Trooper Bessner's and Trooper Kurish's use of force against Biles after he was removed from the vehicle and handcuffed.**

Similarly, the parties have presented competing evidence on the issue of whether Biles continued to engage in active resistance after Defendants removed him from the car and what type of force Defendants

16

used against him before and after he was handcuffed. Summary judgment on the question of whether Troopers Bessner and Kurish used excessive force against Biles once they removed him from the vehicle will be denied because the parties have presented conflicting testimony about both Biles's and the troopers' actions during that time.

Where a person who is restrained is not actively resisting, "even if some level of passive resistance is presented," the Sixth Circuit has held that an officer's use of "significant force," such as tasing, is unreasonable under the Fourth Amendment. *See Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 497–98 (6th Cir. 2012). Conversely, the Sixth Circuit has suggested it was not excessive force for an officer to tase a man after grabbing him and wrestling him to the ground "where the subject was still actively resisting arrest." *Caie*, 485 F. App'x at 96 (citing *Kijowski*, 372 F. App'x at 600 (discussing *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007)). Specifically, the plaintiff in that case kicked and bit officers, and had shoved one of them. *Casey*, 509 F.3d at 1285.

In this case, the kind of force alleged by Plaintiffs to have been used by both Defendants, particularly against Biles after he was placed in handcuffs, appears not only excessive, but sadistic. Nonetheless, because Trooper Kurish has presented evidence—the police report and his own testimony—that controverts Plaintiffs' harrowing version of events, summary judgment on whether those later uses of force by both Defendants were excessive is not appropriate.

17

Although it is undisputed that Trooper Bessner tased Biles several times after Defendants pulled him from the Charger, that both Defendants struck him with their knees, and that Trooper Kurish punched Biles, Kurish has produced evidence that Biles was actively resisting the troopers once they removed him from the car. According to Kurish's testimony as well as the police report, once out of the car, Biles began "punching, kicking, [and] pulling away" from the troopers. ECF No. 18-6, PageID.302. Even more than that, Kurish testified that Biles wrestled away Trooper Bessner's taser in the struggle. ECF No. 18-6, PageID.302. These descriptions of Biles's behavior, which are repeated in the police report, amount to active resistance under Sixth Circuit precedent. ECF No. 20-2, PageID.417. Such acts by Biles, if the factfinder determines they actually took place, would have justified the troopers' use of a taser or knee strikes to subdue him *See Rudlaff*, 791 F.3d at 642. Although officers cannot use force on a detainee who has already been subdued and is not resisting arrest, force may be used if the detainee is physically struggling with law enforcement, refusing to be handcuffed, or otherwise engaging in a kind of active resistance. *Kent*, 810 F.3d at 392, 396 (citing *Grawey*, 567 F.3d at 314). A jury must decide which account of these events is to be believed.

## CONCLUSION

For these reasons, Plaintiff Larry Biles's motion for summary judgment, ECF No. 18, is hereby **DENIED**.

**SO ORDERED.**

Dated: August 18, 2020         s/Terrence G. Berg
                               TERRENCE G. BERG
                               UNITED STATES DISTRICT JUDGE